BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Attorneys for Plaintiff Nathan C. Silva*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN C. SILVA, Derivatively on Behalf of Nominal Defendant DEXCOM, INC., <br><br> Plaintiff, <br><br> v. <br><br> KEVIN R. SAYER, STEVEN R. ALTMAN, NICK AUGUSTINOS, RICHARD A. COLLINS, KAREN DAHUT, RIMMA DRISCOLL, MARK G. FOLETTA, BRIDGETTE P. HELLER, KYLE MALADY, ERIC J. TOPOL, BARBARA E. KAHN and JEREME M. SYLVAIN, <br><br> Defendants, <br><br> and <br><br> DEXCOM, INC., <br><br> Nominal Defendant. | Case No. **'24 CV 1645 AJB VET** <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Nathan C. Silva ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Dexcom, Inc. ("Dexcom" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding Dexcom, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Alonzo v. Dexcom, Inc., et al.,* Case No. 3:24-cv-01485-RSH-VET (S.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action brought by Plaintiff on behalf of Dexcom against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least January 8, 2024 and July 25, 2024, inclusive (the "Relevant Period"), and the federal securities laws, as set forth below.

2.  Dexcom is a biotechnology company based in San Diego, California that manufactures and distributes continuous glucose monitoring (CGM) systems. CGM systems include sensors, transmitters, and receivers and are used by individuals with diabetes to monitor their glucose levels in real-time.

3.  In early 2023, Dexcom introduced its G7 CGM system, marketed as an upgrade over the Company's prior G7 model.

4.     Throughout the Relevant Period, the Individual Defendants disseminated materially false and misleading statements, touting the purported sustainability of the Company's revenue growth, overstating the Company's ability to acquire new customers, and downplaying risks related to seasonality and the Company's own sales personnel constraints.

5.     On July 25, 2024, the truth was revealed when Dexcom issued a press release, announcing disappointing financial results for the second quarter of 2024 which the Company partially attributed to "slower-than-expected new customer growth."

6.     On this news, the price of Dexcom's stock declined a staggering 40.66% in a single day, closing at $64.00 per share on July 26, 2024.

7.     As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

8.     Moreover, in light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15

U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

3. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

4. In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

5. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Dexcom is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

6. Plaintiff is, and has been at all relevant times, a shareholder of Dexcom.

*Nominal Defendant*

7. Nominal Defendant Dexcom is incorporated under the laws of Delaware with its principal executive offices located at 6340 Sequence Drive, San Diego, California 92121. Dexcom's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "DXCM."

*Individual Defendants*

8. Defendant Kevin R. Sayer ("Sayer") has served as a member of the Board since November 2007, as its Chairman since July 2018, as Dexcom's President since 2011 and as its Chief Executive Officer ("CEO") since January

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

2015. Defendant Sayer previously served as Dexcom's Chief Operations Officer ("COO") between January 2013 and January 2015. According to the Company's public filings, Defendant Sayer received $15,712,244 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Sayer beneficially owned 223,925 shares of Dexcom stock, worth $31,233,059.[1] Defendant Sayer is named as a Defendant in the Securities Class Action. During the Relevant Period, Defendant Sayer sold 167,965 shares of Company stock while in possession of material non-public information for proceeds of $22,281,608. While the price of Dexcom stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Sayer made the following sales of Company stock:

- On January 16, 2024, Defendant Sayer sold 37,325 shares of personal holdings of Company stock at an average price of $123.63 per share, reaping $4,614,669 in proceeds.

- On March 12, 2024, Defendant Sayer sold 81,007 shares of personal holdings of Company stock at an average price of $133.36, reaping $10,802,803 in proceeds.

- On April 8, 2024, Defendant Sayer sold 49,633 shares of personal holdings of Company stock at an average price of $138.30, reaping 6,864,136 in proceeds.

9.      Defendant Steven R. Altman ("Altman") has served as a member of the Board since November 2013. According to the Company's public filings, Defendant Altman received $343,399 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Altman beneficially owned 56,017 shares of Dexcom stock, worth $7,813,251. During the Relevant Period, Defendant Altman sold 1,568 shares of Company stock while in possession of material non-public

---

[1] Valuations of the Individual Defendants' holdings of Company stock are based on the $139.48 per share closing price of Dexcom's stock on March 27, 2024.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

information for proceeds of $192,652. While the price of Dexcom stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Altman made the following sale of Company stock:

- On January 16, 2024, Defendant Altman sold 1,568 shares of personal holdings of Company stock at an average price of $122.86, reaping 192,652 in proceeds.

10.     Defendant Nick Augustinos ("Augustinos") has served as a member of the Board since November 2009. According to the Company's public filings, Defendant Augustinos received $362,205 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Augustinos beneficially owned 37,083 shares of Dexcom stock, worth $5,172,336.

11.     Defendant Richard A. Collins ("Collins") has served as a member of the Board since March 2017 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Collins received $345,898 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Collins beneficially owned 39,310 shares of Dexcom stock, worth $5,482,958.

12.     Defendant Karen Dahut ("Dahut") has served as a member of the Board since August 2020. According to the Company's public filings, Defendant Dahut received $345,898 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Dahut beneficially owned 15,166 shares of Dexcom stock, worth $2,115,353.

13.     Defendant Rimma Driscoll ("Driscoll") has served as a member of the Board since August 2023 and serves as a member of the Audit Committee. According to the Company's public filings, Defendant Driscoll received $404,724 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Driscoll beneficially owned 4,008 shares of Dexcom stock, worth $559,035.

14.     Defendant Mark G. Foletta ("Foletta") has served as a member of the Board since November 2014 and serves as Chair of the Audit Committee.

According to the Company's public filings, Defendant Foletta received $393,510 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Foletta beneficially owned 62,398 shares of Dexcom stock, worth $8,703,273. During the Relevant Period, Defendant Foletta sold 6,000 shares of Company stock while in possession of material non-public information for proceeds of $702,029. While the price of Dexcom stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Foletta made the following sales of Company stock:

- On June 17, 2024, Defendant Foletta sold 2,694 shares of personal holdings of Company stock at an average price of $117.26, reaping 315,907 in proceeds.

- On June 18, 2024, Defendant Foletta sold 3,306 shares of personal holdings of Company stock at an average price of $116.79, reaping 386,122 in proceeds.

15. Defendant Bridgette P. Heller ("Heller") has served as a member of the Board since September 2019. According to the Company's public filings, Defendant Heller received $346,493 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Heller beneficially owned 23,731 shares of Dexcom stock, worth $3,309,999. During the Relevant Period, Defendant Heller sold 1,000 shares of Company stock while in possession of material non-public information for proceeds of $113,550. While the price of Dexcom stock was artificially inflated due to the Individual Defendants' false and misleading statements, Defendant Heller made the following sale of Company stock:

- On June 14, 2024, Defendant Heller sold 1,000 shares of personal holdings of Company stock at an average price of $113.55, reaping 113,550 in proceeds.

16. Defendant Kyle Malady ("Malady") has served as a member of the Board since October 2020. According to the Company's public filings, Defendant

Malady received $343,399 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Malady beneficially owned 15,529 shares of Dexcom stock, worth $2,165,984.

17.    Defendant Eric J. Topol ("Topol") has served as a member of the Board since July 2009. According to the Company's public filings, Defendant Topol received $346,493 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Topol beneficially owned 377,927 shares of Dexcom stock, worth $52,713,257.

**Former Director Defendant**

18.    Defendant Barbara E. Kahn ("Kahn") served as a member of the Board between April 2011 and May 22, 2024. According to the Company's public filings, Defendant Kahn received $348,398 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Kahn beneficially owned 25,502 shares of Dexcom stock, worth $3,557,018.

**Officer Defendant**

19.    Defendant Jereme M. Sylvain ("Sylvain") has served as Dexcom's Chief Financial Officer ("CFO") since March 2021 and as its Chief Accounting Officer ("CAO") since March 2020. Prior to his role as CFO, Defendant Sylvain served as Dexcom's Senior Vice President, Finance from March 2020 until March 2021. Defendant Sylvain joined the Company in September 2018 as its Vice President, Finance and Corporate Controller. According to the Company's public filings, Defendant Sylvain received $4,254,900 in 2023 in compensation from the Company. As of March 27, 2024, Defendant Sylvain beneficially owned 32,122 shares of Dexcom stock, worth $4,480,376. Defendant Sylvain is named as a defendant in the Securities Class Action. During the Relevant Period, Defendant Sylvain sold 18,503 shares of Company stock while in possession of material non-public information for proceeds of $2,383,657. While the price of Dexcom stock was artificially inflated due to the Individual Defendants' false and misleading

statements, Defendant Sylvain made the following sales of Company stock:

- On January 16, 2024, Defendant Sylvain sold 2,734 shares of personal holdings of Company stock at an average price of $123.63, reaping 338,018 in proceeds.
- On February 20, 2024, Defendant Sylvain sold 3,363 shares of personal holdings of Company stock at an average price of $116.73, reaping 392,563 in proceeds.
- On March 12, 2024, Defendant Sylvain sold 11,661 shares of personal holdings of Company stock at an average price of $134.41, reaping 1,567,363 in proceeds.
- On June 10, 2024, Defendant Sylvain sold 745 shares of personal holdings of Company stock at an average price of $115.05, reaping 85,713 in proceeds.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

20.     By reason of their positions as officers and/or directors of Dexcom, and because of their ability to control the business and corporate affairs of Dexcom, the Individual Defendants owed Dexcom and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Dexcom in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Dexcom and its shareholders so as to benefit all shareholders equally.

21.     Each director and officer of the Company owes to Dexcom and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

/ / /

/ / /

22.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Dexcom, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

23.    To discharge their duties, the officers and directors of Dexcom were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

24.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Dexcom, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

25.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

26.     To discharge their duties, the officers and directors of Dexcom were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Dexcom were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Dexcom's own Code of Conduct and Business Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Dexcom conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Dexcom and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Dexcom's operations would comply with all applicable laws and Dexcom's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's

shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

27.     Each of the Individual Defendants further owed to Dexcom and the shareholders the duty of loyalty requiring that each favor Dexcom's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

28.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Dexcom and were at all times acting within the course and scope of such agency.

29.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Dexcom.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

30.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of

their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

31.   The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

32.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

33.   In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Dexcom, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

34.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

35.   At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Dexcom and at all times acted within the course and scope of such agency.

/ / /

## DEXCOM'S CODE OF CONDUCT

36.     Dexcom's Code of Conduct begins with a message from Defendant Sayer which states, in pertinent part:

> Our tremendous growth story is a testament to the profound trust our stakeholders have given us. To keep this trust, each of us must conduct our business in an ethical, responsible, and principled manner. We each have a responsibility to act with integrity and to make the right decisions that uphold our core values and help us achieve our business objectives.

37.     The Code of Conduct applies to "all Dexcom officers, directors, and employees," and violations of the Code of Conduct will lead to "disciplinary action, up to and including termination of employment."

38.     With respect to the Company's "Core Values," the Code of Conduct states, in pertinent part: "At Dexcom, we operate with the highest standards of ethics and integrity. Every day, we strengthen our culture by following ethical practices and complying with all applicable laws and regulations, which allows us to maintain our reputation as the leader in transforming diabetes care."

39.     In a section titled "Healthcare Laws and Regulatory Requirements," the Code of Conduct states, in pertinent part:

> Dexcom is subject to many laws and regulations designed to protect patients and consumers, improve the quality of medical devices and healthcare services, and help eliminate fraud and improper influence on medical judgment.
>
> Our success depends upon every Employee's commitment to following these laws and regulations.

40.     In a section titled "Accuracy of Corporate Books and Records," the Code of Conduct states, in pertinent part:

> Dexcom's financial books, records, and accounts must fully, accurately, and fairly reflect business transactions.

---

13

They must also comply with applicable laws, regulations, and accounting practices, as well as internal policies and procedures. This helps Dexcom meet our obligations to investors, employees, and business partners, as well as the public and government agencies.

**Guiding Principles**

- All Employees are responsible for ensuring any books and records they create or are responsible for are compliant. We can achieve that by ensuring:
    - All records are complete, accurate, and honest.
    - All records are submitted in a timely manner.
    - All records are in accordance with applicable standards and internal policies and procedures.

41.    With respect to insider trading, the Code of Conduct states that "[i]nsider trading is strictly prohibited. Never purchase or sell, either directly or through another person, any type of security while you are aware of material, non-public information about Dexcom or other companies."

42.    In a section titled "Intellectual Property, Company Assets, and Confidential Business Information," the Code of Conduct states that "[t]heft, carelessness, and waste have a direct impact on Dexcom's profitability. Each of us must ensure that Dexcom property is used for legitimate business purposes."

## DEXCOM'S AUDIT COMMITTEE CHARTER

43.    Pursuant to Dexcom's Audit Committee Charter, the purpose of the Audit Committee is to "assist the Board in fulfilling its statutory and fiduciary oversight responsibilities relating to the Company's financial accounting, reporting and controls."

44.    According to the Audit Committee Charter, the Audit Committee's principal functions are to:

- oversee the accounting and financial reporting processes of the issuer and the audits of the financial statements of the issuer;
- monitor the periodic reviews of the adequacy of the accounting and financial reporting processes and systems of internal control that are

conducted by the Company's independent auditors and the Company's financial and senior management;

- review and evaluate the independence and performance of the Company's independent auditors;

- review with management the Company's major financial risk exposures and the steps management has taken to monitor or mitigate such exposures.

45.    In a subsection titled "**Financial Statements and Disclosures,**" the Audit Committee Charter states that the Audit Committee shall:

- Review and discuss with management the quarterly results and the type and presentation of information to be included in the Company's related earnings press release prior to distribution to the public.

- Review and discuss with management the Company's quarterly and annual financial statements and any report or opinion by the independent auditors, prior to distribution to the public or filing with the Commission.

46.    With respect to the Audit Committee's review of the Company's annual financial statements, the Audit Committee Charter states that the Audit Committee shall:

Discuss any items required to be communicated by the independent auditors in accordance with the applicable requirements of the Public Company Accounting Oversight Board (the "PCAOB") Statement on Auditing Standards ("SAS") No. 114, The Auditor's Communication With Those Charged with Governance (supersedes No. 61, Communication With Audit Committees) (Codification of Statements on Auditing Standards, AU § 380), as amended. These discussions should include the independent auditors' judgments about the quality and appropriateness of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures in the Company's financial statements and any significant difficulties encountered during the course of the audit, including any restrictions on the scope of work or access to required information.

47.    With respect to the Audit Committee's review of the Company's

quarterly financial statements, the Audit Committee Charter states that the Audit Committee shall:

> Discuss significant issues, events and transactions and any significant changes regarding accounting principles, practices, judgments or estimates with management and the independent auditors, including resolution of any disagreements among management and the independent auditors regarding financial reporting.

48.    The Audit Committee Charter further states that the Audit Committee shall:

> Review any (i) the adequacy of the Company's accounting and financial reporting processes and systems of internal controls, (ii) any significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting or (ii) fraud involving management or any employee of the Company with a significant role in the Company's internal controls over financial reporting that are disclosed to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer in connection with such officers' periodic review of the Company's internal controls over financial reporting.

49.    In a subsection titled "**Internal Controls,**" the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

> Discuss with the Company's principal accounting officer the function of the Company's disclosure controls and procedures and any disclosure committee that may be established by the Company. Discuss with the Company's Chief Executive Officer and Chief Financial Officer their conclusions regarding the effectiveness of the Company's disclosure controls and procedures.
>
> * * *
>
> Review with management the Company's major financial risk exposures and the steps management has taken to monitor such exposures, including the Company's procedures and any related policies, with respect to financial risk assessment and financial risk management.

# SUBSTANTIVE ALLEGATIONS

## *Background*

50.    Dexcom is a biotechnology company based in San Diego, California that manufactures and distributes continuous glucose monitoring (CGM) systems. CGM systems include sensors, transmitters, and receivers and are used by individuals with diabetes to monitor their glucose levels in real-time.

51.    In early 2023, Dexcom introduced its G7 CGM system, marketed as an upgrade over the Company's prior G7 model.

52.    Throughout the Relevant Period, the Individual Defendants disseminated materially false and misleading statements, touting the purported sustainability of the Company's revenue growth, overstating the Company's ability to acquire new customers, and downplaying risks related to seasonality and the Company's own sales personnel constraints.

## *The Individual Defendants' False and Misleading Statements*

53.    On January 8, 2024, Dexcom issued a press release, announcing fiscal 2024 guidance and reporting preliminary financial results for the fourth quarter and full year 2023. With respect to its fiscal 2024 guidance, the Company projected "total revenue of approximately $4.15 billion to $4.35 billion, representing expected organic growth of approximately 16% to 21% over 2023."

54.    That same day, at the J.P. Morgan 42nd Annual Healthcare Conference 2024, Defendant Sylvain justified the Company's fiscal 2024 guidance:

> So I think when you think about guidance, there's a couple of different things in there. So first and foremost, what is now excluded in that number, the raw top line number is our non-CGM business, with the expectation that, that comes out of the business. So there is an assumption there.
>
> ***In terms of that growth, it does assume another year of record new patients. So I think global record new patients.*** I think you can presume that there it does, when Kevin said a modest contribution from our non-insulin product, our 15-day product, we assume about 1 point

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

of revenue associated with that. So that gives you some context around that.

And the rest is healthy growth really across the board in basal and the intensive population globally. ***As you move down the line, you think about gross margin, if you rewind back to 2023, we really started 2023 with a 62% to 63% gross margin, and we're going to outpace that this year.*** Some of that is just due to the timing of transition from G6 to G7. So Kevin alluded to it earlier. The expectation is, as we move through that transition, there's a little bit of that. So some of that's embedded. It doesn't change our long-term plans. Ultimately, we are on track for the cost profile we would expect on G7 at $10 sensor. And I would expect us to continue to make progress.

There is no 15-day intensive insulin or G-Series product assumptions on gross margin in there. So hopefully, that's a little bit helpful. And then the continuation of leverage through the P&L, I think you'd expect to continue to see us do that. ***We had a really strong year in 2022, 2023 in terms of driving leverage. That leverage continues as we move into 2024.***[2]

55.    On February 8, 2024, Dexcom announced its financial results for the fourth quarter and full year 2023 and affirmed its fiscal 2024 guidance.

56.    During an earnings call, hosted by the Company on the same day, Defendant Sylvain stated, in relevant part:

Turning to 2024 guidance. As we stated last month, we anticipate total revenue to be in the range of $4.15 billion to $4.35 billion, representing organic growth of 16% to 21% for the year. This guidance assumes continued momentum in the type 2 basal-only population in the U.S., the expansion of Dexcom ONE on the G7 platform into new geographies, and the launch of Stelo in the summer of 2024. It also assumes the divestiture of our non-diabetes distribution business in Australia and New Zealand this quarter, which represented around $30 million of revenue in 2023.

---

[2] Unless indicated otherwise, all emphasis is added.

From a margin perspective, we expect full year non-GAAP gross profit margin to be in a range of 63% to 64%, operating profit margin to be approximately 20%, and adjusted EBITDA of approximately 29%. ***Our gross margin guidance reflects the ongoing conversion from G6 to G7 within our customer base and the associated scale that comes with that process.*** Below gross margin, we'll continue to be very diligent with our spend in 2024, while investing strategically behind multiple growth opportunities.

57.     On March 5, 2024, at the 45th Annual Raymond James Institutional Investors Conference 2024, Sean Christensen, Dexcom's Director of Corporate Affairs and Head of Investor Relations, reaffirmed the Company's fiscal 2024 guidance:

For 2024, we expect this significant growth to continue. We've guided our top line growth for the year to 16% to 21% organic growth. Gross margin for the year is 63% to 64%, which is relatively flat, slightly down versus 2023. Really, we're in the process of transitioning from our G6 hardware platform to our G7. And so as we build volumes, that will help us to scale and drive greater margin efficiency at the gross margin level, continued operating margin expansion to about 20% and adjusted EBITDA margin of 29% forecast for this year. You see some of the assumptions there. But I think for us, this is a year in which we build on the access expansion that we had last year and continue to capitalize both within the U.S. and internationally.

If you think about then how do we execute on this vision and the strong growth opportunity, it really starts with an excellent product, and that's what we have in G7. With Dexcom G7, we have what we believe to be new standard in CGM technology around the world. G7 is the most accurate CGM that has been cleared by the FDA and offering that standard Dexcom performance that people have come to expect and trust over the years.

*    *    *

And Dexcom CGM with G7 is also the most covered CGM in the U.S. We fought incredibly hard to ensure that our patients not only have access to the technology, but have as low of an out-of-pocket cost as

possible, given that they rely on this for managing a complex condition. And in doing so, we've been able to really expand our coverage and lead the industry with robust coverage. But we're not sitting still on Dexcom G7. We continue to expand and innovate. And so we've talked about expanding the sensor wear from the current 10.5 day to what we hope will be a 15-day sensor wear. That has entered kind of the clinical testing phase that we talked about last year when we introduced these enhancements to the G7 platform at our Investor Day, so we continue to build. And obviously, that would be a nice benefit for our users and certainly for us from a cost perspective, if we can move from a 3 sensor per month to 2 sensor per month dynamic.

We also continue to make sure that we're driving the most volume to our G7 platform so that we can get the most out of the automated lines and manufacturing scale that we've built out in our San Diego, Mesa, Arizona and Malaysia manufacturing facilities.

58.     On April 22, 2024, the Company filed a Proxy Statement on Form DEF 14A (the "2024 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to serve for another one-year term on the Company's Board a non-binding shareholder vote on the compensation of certain of the Company's executive officers, including Defendants Sayer and Sylvain.

59.     The 2024 Proxy continued to highlight the launch of the Company's G7 platform, stating that "[d]emand for Dexcom CGM remained high behind the rollout of our newest generation product, Dexcom G7, and we significantly expanded access globally. . . . This past year, we increased our prescriber base by approximately 40% in the United States as Dexcom G7's ease of use and leading performance attracted new clinicians to our ecosystem."

60.     The 2024 Proxy stated that the Audit Committee is responsible for, *inter alia*, "[o]verseeing [Dexcom's] accounting and financial reporting processes and the audits of [its] financial statements," "[m]onitoring the periodic reviews of the adequacy of [Dexcom's] accounting and financial reporting processes and

systems of internal control," and "[r]eviewing with management [Dexcom's] major financial risk exposures and the steps management has taken to monitor or mitigate such exposures."

61.    With respect to the Company's "Corporate Governance Highlights," the 2024 Proxy stated that Dexcom's "internal audit function maintains critical oversight over the key areas of our business and financial processes and controls."

62.    The statements contained in the 2024 Proxy were materially false and misleading because they failed to disclose the risks associated with scaling the Company's customer transition to the G7 platform. Further, despite the 2024 Proxy's descriptions of the Board's and its committees' oversight responsibilities with respect to risk management and internal controls over financial reporting, the Board and its committees were not adequately fulfilling these responsibilities and were causing or permitting the Company to issue false and misleading statements.

63.    On April 25, 2024, the Dexcom issued a press release announcing its financial results for the first quarter of 2024 and revising the Company's fiscal 2024 guidance upward. In the press release, Defendant Sayer stated:

> Dexcom is off to a great start in 2024, delivering another quarter of strong financial results while advancing several key strategic initiatives.
>
> * * *
>
> This is shaping up to be another exciting year for Dexcom as we launch new product innovations and work to improve access to Dexcom CGM around the world.

64.    During an earnings call, hosted by the Company on the same day, Defendant Sylvain justified the Company's revised guidance, stating:

> Turning to guidance. ***We are raising the midpoint of our revenue guidance with an updated range of $4.20 billion to $4.35 billion, representing organic growth of 17% to 21% for the year. For margins, we are reaffirming our prior full year guidance*** of non-GAAP gross profit margin in a range of 63% to 64%, non-GAAP

operating margin of approximately 20% and adjusted EBITDA margin of approximately 29%.

65.     During the question-and-answer portion of the call, the following exchange occurred between Defendant Sylvain and an analyst from J.P. Morgan Chase:

Q: Robert Justin Marcus – JPMorgan Chase & Co.:

Congrats on a nice quarter. I wanted to talk about the leverage we saw down the P&L. It was pretty impressive. It will be by like 150 bps on operating margin. So just wanted to see how we should think about gross margin progression, operating margin progression throughout the year, I saw the reiterated guidance but just trying to think about cadence, especially in light of the Stelo launch and the key drivers of that upside in the quarter and how we should think about that moving through the year?

A: Jereme M. Sylvain:

Yes. Sure, Robbie. Thanks for the question. ***The way to think about gross margin and is that of course over the course of the year, we talked -- when we set guidance that this was going to look a little bit like a more typical year. And in a more typical year, you generally see 300 to 400 basis points of expansion over the course of the year. And that's what I'd expect to see over the course of this year.***

A lot happened last year with the transition from G6 to G7. It's not a typical year. We had a new manufacturing facility coming online. But as you kind of go back into years prior to that, you see that sort of cadence. That's how we're thinking about it, at least over the course of the year right now. And so that gives you some context for that cadence from an op margin perspective or at least an OpEx spend perspective, we've already made the investment in the sales force. And so that you see playing through in the first quarter. And to your point, you saw some nice leverage in the first quarter.

We will be making investments, further investments in Japan here as we go live in the second quarter, and that will play out over the course

of the year. And then obviously, associated with the launch of Stelo over the course of the summer, we'll be making investments there. So while we won't get the same leverage that you ultimately saw in the first quarter over the balance of the year. You should expect some leverage over the course of the year, and that ultimately contributes down to what you'd see as an expansion of op margin despite a gross margin guide, that's about a bit of a click back from the prior year. So that's the way to think about it.

In terms of the over performance in the Q1, I think you're alluding to the beat in terms of op margin. I think the takeaway here is it's an encouraging sign for us. **We've demonstrated over the past few years, we can drive leverage into this business. This year is no exception.** All of the efforts that we've been talking about in prior years continue. However, it's a little early to change how we're thinking about the full year first quarter. And as you mentioned, a nice start to the first quarter, and we'll keep you updated on progress as the year progresses.

66.    On June 5, 2024, at the 44th Annual William Blair Growth Stock Conference, the following exchange occurred between an analyst and Defendant Sylvain regarding the Company's fiscal 2024 guidance:

Q: Malgorzata Maria Kaczor Andrew – William Blair & Company LLC:

And so maybe just to wrap all of that up, as we think about your guidance both for the second quarter, you did have some comments, maybe you're not specific as much for guidance for Q2. But walk us through what you said on Q2, full year and what was contemplated in that? And then third piece, how does that compare to the Street estimates and whether you're comfortable with that?

A: Jereme M. Sylvain:

Sure. Yes. I think last time we spoke, the question was how you think about the estimates in Q2. We don't guide the quarters. So we said things are reasonable. I think it's a reasonable outcome. **And in terms of the full year, as of the last quarter, when we issued our earnings, we raised our guidance.** And so that should give -- **we obviously beat**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*the Street expectations in the first quarter, raised guidance and continue to do well.* So I think from that point of view, *I think we're happy with where we are. We're happy with our full year guidance.* We don't guide to the quarters, but we were very comfortable with where folks are sitting for the quarter.

67.     The statements identified above in ¶¶ 53-66 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose: (i) the Company's revenue growth was unsustainable; (ii) the Company was facing significant risk related to seasonality and macroeconomic fluctuations; (iii) the Company was unable to attract sufficient new customers while keeping existing distribution channels afloat; and (iv) as a result of the foregoing, positive statements regarding the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

**The Truth Emerges**

68.     On July 25, 2024, Dexcom issued a press release, announcing disappointing financial results for the second quarter of 2024:

- Revenue grew 15% year-over-year to $1.004 billion on a reported basis and 16% year-over-year on an organic basis.
- U.S. revenue grew 19% and international revenue grew 7% on a reported basis and 10% on an organic basis, all on a year-over-year basis.
- GAAP operating income of $158.0 million or 15.7% of revenue, an increase of 100 basis points compared to the second quarter of 2023. Non-GAAP operating income of $195.4 million or 19.5% of reported revenue, an increase of 130 basis points compared to the second quarter of 2023.

* * *

Third Quarter and 2024 Annual Guidance and $750 Million Share Repurchase Program

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Revenue of approximately $4.00 - 4.05 billion (11 - 13% organic growth)
- Non-GAAP Gross Profit Margin of approximately 63%
- Non-GAAP Operating Margin of approximately 20%
- Adjusted EBITDA Margin of approximately 29%

***In addition, to account for certain unique items impacting 2024 seasonality, the company is establishing guidance for third quarter 2024 Revenue of approximately $975 million to $1.00 billion (1 - 3% organic growth).***

The company also announced a $750 million share repurchase program in conjunction with second quarter results.

69.    The press release quoted Defendant Sayer as stating: "While Dexcom advanced several key strategic initiatives in the second quarter, our execution did not meet our high standards."

70.    During an earnings call, hosted by the Company the same day, Defendant Sayer stated:

First, ***as we've worked through our U.S. sales force realignment expansion, we have seen our share of new customers fall short of our expectations*** despite still strong absolute customer additions. Second, our U.S. revenue per customer has stepped down faster than expected based on 2 primary drivers: rebate eligibility and channel mix.

\* \* \*

U.S. customer growth has remained strong in our pharmacy business as we expand our reach into primary care and type 2 diabetes more broadly. ***However, our growth in the DME channel has trailed our plan. The DME distributors remain important partners for us in our business, and we've not executed well this quarter against these partnerships. We need to refocus on those relationships.***

Finally, ***our international performance was also lighter than***

***expectations in the quarter.*** While we delivered strong performance in some of our core markets such as the U.K. and France, we saw category growth soften in certain geographies as type 1 penetration advances in these regions.

71.   With respect to the Company's decreased revenue guidance, Defendant Sylvain stated:

> Turning to guidance. Starting with full year 2024, we are decreasing our revenue guidance to a range of $4.00 billion to $4.05 billion, representing organic growth of 11% to 13% for the year. As mentioned earlier, ***the compounding effect of our slower-than-expected new customer growth in the U.S. DME channel and international business as well as increased pharmacy eligibility resulted in the need to recalibrate the guide. Our updated guidance reflects these dynamics and assumes a longer ramp in productivity in our U.S. sales force.*** For margins, we are reducing our non-GAAP gross profit margin guidance to approximately 63%, while maintaining our prior guidance on non-GAAP operating margin and adjusted EBITDA at approximately 20% and 29%, respectively.

> In addition to our annual guidance, we are providing 2 additional data points to help investors and analysts understand some of the unique elements impacting our revised guidance in 2024. First, the impact to new patients from our sales force initiative combined with our revenue per customer trends that Kevin detailed will change the historical seasonality pattern that we have typically experienced. These impacts are expected to reach their peak in the third quarter, with total revenue expected to be between $975 million and $1 billion. In conjunction with this revenue outlook, we thought it would be helpful to provide a midyear update on our global active customer base, which we now estimate to be between 2.5 million and 2.6 million. This represents strong growth over where we finished 2023, though the growth percentage has decelerated slightly. Our hope is these updates will provide additional visibility as our team works to implement several of the areas of focus that we have aligned on over the past month and as our sales force continues to ramp their efficiency.

72.   On this news, the price of Dexcom's stock declined a staggering 40.66% in a single day, wiping out roughly $17 billion in market capitalization.

Specifically, the price of the Company's stock declined from $107.85 per share on July 25, 2024 to $64.00 per share on July 26, 2024.

*Insider Sales*

73.    During the Relevant Period, Defendants Sayer, Altman, Heller, Foletta, and Sylvain (the "Insider Trading Defendants") each made unusually timed sales of Company stock while in possession of material non-public information concerning the Company's financial condition and business prospects.

74.    The Insider Trading Defendants collectively reaped millions of dollars in profits selling their personal holdings of Company stock at prices as high as $138, more than **200%** of the stock's closing price of $64.00 after the corrective disclosures.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

75.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

76.    Dexcom is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

77.    Plaintiff is a current shareholder of Dexcom and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

78.    A pre-suit demand on the Board of Dexcom is futile and, therefore, excused. At the time this action was commenced, the ten-member Board was comprised of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol (the "Director Defendants"). Accordingly, Plaintiff is only required to show that five Directors cannot exercise independent

objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

79.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

80.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

81.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

82.     Defendant Sayer is not disinterested or independent, and therefore, is incapable of considering a demand because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period. Moreover, Defendant Sayer serves as the Company's President and CEO. Accordingly, the Company acknowledges that Defendant Sayer is a non-independent director.

83.     Defendants Collins, Driscoll, and Foletta serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in

fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

84.    The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

85.    All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Specifically, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Director Defendants have sought to enforce the Company's Clawback Policy, which requires that the Board:

/ / /

[R]ecover certain incentive-based compensation (as defined in the Clawback Policy) paid or granted to [Dexcom's] officers, and such additional employees as may be identified from time to time, in the event [the Company is] required to prepare an accounting restatement due to [its] material noncompliance with any financial reporting requirement under the securities laws. The policy requires each person covered thereby to reimburse or forfeit to [Dexcom] all incentive-based compensation received by them prior to the restatement that exceeds the amount they would have received had they're incentive-based compensation ben calculated based on the financial restatement. The recovery period extends up to three years prior to the date that it is, or reasonably should have been, concluded that [Dexcom is] required to prepare a restatement.

86.     Additionally, Defendants Sayer, Altman, Heller, and Foletta materially benefitted from the misconduct alleged herein through insider sales of Company stock.

87.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

88.     The acts complained of herein constitute violations of fiduciary duties owed by Dexcom's officers and directors, and these acts are incapable of ratification.

89.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to

purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of Dexcom. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Dexcom, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

90.     If there is no directors' and officers' liability insurance, then the directors will not cause Dexcom to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

91.     Thus, for all of the reasons set forth above, all of Dexcom's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act and Rule 14a-9

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.     The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

94.     The Individual Defendants, individually and in concert, disseminated

and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy. As alleged above, the 2024 Proxy contained materially false and misleading statements concerning the launch of the Company's G7 platform, the sustainability of the Company's customer growth, and the adequacy of the Company's internal controls over financial reporting.

95.     The 2024 Proxy was used to solicit shareholder votes in connection with the re-election of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol to serve for another one-year term on the Company's Board. Additionally, the 2024 Proxy was used to solicit the advisory vote to approve the compensation of, *inter alia*, Defendants Sayer and Sylvain. While the shareholder vote was non-binding, the 2024 Proxy indicated that the "Board and the Compensation Committee value the opinions expressed by stockholders and will consider the outcome of the vote when making future compensation decisions for [Dexcom's executive officers]."

96.     Describing the Company's "Compensation Philosophy and Objectives," the 2024 Proxy indicated that compensation is performance-based, stating that "an important aspect of [the Company's] overall compensation philosophy is to emphasize equity and performance-based incentive compensation."

97.     The materially false and misleading statements contained in the 2024 Proxy regarding the Company's G7 platform and the adequacy of its internal controls therefore misleadingly induced shareholders to vote in favor of the election of Defendants Sayer, Altman, Augustinos, Collins, Dahut, Driscoll, Foletta, Heller, Malady, and Topol and performance-based compensation to Defendants Sayer and Sylvain, to which they were not entitled.

98.     The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

/ / /

## COUNT II

### Against the Individual Defendants

### For Breach of Fiduciary Duty

99.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.   The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

101.   The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

102.   The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

103.   As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

104.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide

damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT III

### Against the Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

105.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

106.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties.  In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

107.   Plaintiff on behalf of Dexcom has no adequate remedy at law.

## COUNT IV

### Against the Insider Trading Defendants
### For Breach of Fiduciary Duties (*Brophy* Claim)

108.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.   During the Relevant Period, the Insider Trading Defendants held positions with the Company that provided them access to confidential, proprietary information concerning the Company's financial condition and future business prospects. Notwithstanding their duty to refrain from trading in Dexcom common stock under the circumstances, the Insider Trading Defendants sold their holdings in the Company at artificially inflated prices prior to the disclosure of the true state of the Company's finances and future prospects.

/ / /

110.   The insider sales detailed herein, were not part of any regular pattern of sales for the Insider Trading Defendants and were suspicious in terms of timing and amount.

111.   The information at issue was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold Dexcom stock. At the time of their stock sales, the Insider Trading Defendants were aware that the Company's business and prospects were declining, which when disclosed to the market would cause the inflated price of the Company's common stock to significantly decrease.  The Insider Trading Defendants' sales of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith

112.   Plaintiff, on behalf of Dexcom, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

113.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Dexcom.

115.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Dexcom that were tied to the performance or artificially inflated valuation of Dexcom, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

/ / /

116.   The Insider Trading Defendants were further unjustly enriched with respect to insider sales of Company stock.

117.   Plaintiff, as a shareholder and a representative of Dexcom, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

118.   Plaintiff on behalf of Dexcom has no adequate remedy at law.

## COUNT VI

### Against the Individual Defendants for Abuse of Control

119.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.   The Individual Defendants misconduct alleged herein constituted an abuse of their control over the Company, for which they are legally liable.

121.   As a direct and proximate cause of the Individual Defendants' abuse of control, the Company has sustained substantial damages.

122.   Plaintiff on behalf of the Company has no adequate remedy at law.

## COUNT VII

### Against the Individual Defendants for Waste of Corporate Assets

123.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

125.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and colleting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal

liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

126.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

127.   Plaintiff on behalf Dexcom has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.   Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.   Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.   Awarding punitive damages;

D.   Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.   Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 13, 2024                    Respectfully submitted,

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**

*/s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

BETSY C. MANIFOLD
RACHELE R. BYRD
ALEX J. TRAMONTANO
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

**RIGRODSKY LAW, P.A.**
Seth D. Rigrodsky
Timothy J. MacFall
Samir Aougab
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: sdr@rl-legal.com
Email: tjm@rl-legal.com
Email: sa@rl-legal.com

**GRABAR LAW OFFICE**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: 267-507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff Nathan C. Silva*

## <u>VERIFICATION OF NATHAN SILVA</u>

I, Nathan Silva, am a plaintiff in this action.  I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 9/5/2024 _____

DocuSigned by:

*Nathan Silva*

C3263758AD4944B...

Nathan Silva